IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

TYSHANNA NUNESS,

              Plaintiff,

      v.

SIMON AND SCHUSTER, INC., et
al.,

              Defendants.

HONORABLE JEROME B. SIMANDLE

Civil Action
No. 16-2377(JBS/KMW)

**OPINION**

APPEARANCES:

Lance D. Brown, Esq.
Toni L. Telles, Esq.
LANCE BROWN AND ASSOCIATES, LLC
1898 Route 33
Hamilton, NJ 08690
    Attorneys for Plaintiff

Paul C. Evans, Esq.
Andrew Ashworth Napier, Esq.
MORGAN, LEWIS & BOCKIUS LLP
1701 Market St.
Philadelphia, PA 19103
    Attorneys for Defendants

**SIMANDLE, District Judge:**

## I.    INTRODUCTION

Plaintiff Tyshanna Nuness ("Plaintiff"), filed this law suit against her previous employer, Simon & Schuster, Inc. ("Defendant"), wholly owned by CBS Corporation (collectively "Defendants"), as well as John Does 1-100 and ABC Corps 1-100, alleging racial harassment, constructive discharge, and

retaliatory discharge under the New Jersey Law Against Discrimination ("NJLAD"). [Docket Item 20.]

Before the Court is Defendant's Motion for Summary Judgment on all claims pursuant to Fed. R. Civ. P. 56. [Docket Item 25.] Plaintiff opposes the motion for summary judgment [Docket Item 28].

The principal issues presented by Defendant's motion are whether Plaintiff can establish a prima facie case for racial harassment by (1 presenting evidence of severe or pervasive conduct; and, (2) presenting evidence that Defendants are vicariously liable for the alleged harassment. Additionally, before the Court is also the question of whether Plaintiff has proffered evidence to create a genuine dispute of material fact that a reasonable jury could find meets the high burden of showing constructive discharge; and if Plaintiff experienced an adverse employment action, whether there is the requisite causal connection to racial harassment in order to establish retaliation.

For the reasons set forth below Defendant's Motion for Summary Judgment will be denied.

## II. BACKGROUND

### A. Factual Background

1. Plaintiff's Employment and Defendant's Non-Discrimination and Anti-Harassment Policy

Plaintiff is an African American female who was previously employed as a Line Picker with Defendant, beginning in December 2014. (Def. SMF ¶ 1-2.) On December 29, 2014, Plaintiff began working the night shift, Sunday to Thursday from 11:00 p.m. to 7:00 a.m. (Pl. Dep. at 27:10-21.) In this role, Plaintiff "filled cartons with books to fulfill customer orders," and her immediate supervisor was Marcellus Wilson ("Wilson"). (Def. SMF ¶ 2; Pl. Dep. at 31:3-10.)

While employed with Defendants, Christopher Hankins ("Hankins"), a Caucasian male, was one of Plaintiff's co-workers and fellow Line Picker within the same department as Plaintiff. (Def. SMF ¶ 2; Pl. Dep. at 41:12-14.) Hankins was in his first year of employment with Defendant. (Pl. SMF ¶ 37.) He attended the same meetings as Plaintiff, and they performed the same jobs. (Pl. Dep. at 41:20-23.) At times, Plaintiff and Hankins were on the same two to three-person team while working. (Id. at 41:24-42:2.)

According to Plaintiff, one week before Hankins made a racial comment to her, she heard Hankins making inappropriate sexual jokes and was aware of other inappropriate comments Hankins made. But prior to March 12, 2015, Hankins did not make inappropriate comments to Plaintiff, nor did Plaintiff complain of specific comments. (Pl. SMF ¶ 51-42; Pl. Dep. 74 21-22.) Plaintiff did, however, complain to Wilson about Hankins "a

number of times[,]" stating he was "erratic," and further
questioned his employment with Defendants. (Def. SMF ¶ 7; Pl.
SMF ¶ 53.) Plaintiff stated that she heard Hankins discussing
how Defendants "won't fire [him]" and that he can say what he
wants because "they needed his father's signature." (Pl. Dep. at
75:15-24-76:8.) Defendant alleges, and Plaintiff does not
dispute, that Defendant's Human Resources Department did not
receive any formal complaints about Hankins regarding
inappropriate comments or conduct prior to Plaintiff's complaint
on March 12, 2015. (Def. SMF ¶ 6; Tuccillo Dep. at 45:18-46:3.)
Plaintiff does argue that "plenty of reports concerning
[Hankins's] bothersome conduct [were] made to a supervisor
(although these reports were not turned over)." [Docket Item 28-
2 at 16.]

Pursuant to Defendants' policies, problems with an employee
during his or her first year of employment with Defendant
usually led to termination. (Tuccillo Dep. at 122:4-15; Pl. Ex.
H.) Specifically, "violations of attendance and performance" are
"situations that would warrant somebody within their first year
to be terminated without written warning,"; notwithstanding this
fact, Defendant's HR representative testified that situations of
racial discrimination and harassment warrant warnings rather
than termination without written warning. (Tuccillo Dep. at
122:22-123:23; Pl. SMF ¶ 61; Pl. Ex. H.)

Despite this distinction, Defendants argue that they have and maintain a "zero tolerance policy towards racial discrimination." (Pl. SMF ¶ 54.) The "Non-discrimination and Anti-Harassment Policy ("the Policy") "'strictly prohibits harassment' on the basis of any protected characteristic" and prohibits retaliation. (Def. Ex. C.) The policy specifically provides that:

> CBS is committed to a work environment in which all individuals are treated with respect and dignity. Each individual has the right to work in a professional atmosphere that promotes equal employment opportunities and prohibits discriminatory practices, including harassment. Therefore, CBS expects that all relationships among persons in the workplace will be business-like and free of bias, prejudice and harassment.

(Def. Ex. C at 1.) "The policy outlines the procedure for reporting an incident of harassment, discrimination or retaliation." (Def. SMF ¶ 30.) The policy also explains who employees should report such conduct to, which includes but is not limited to immediate supervisors and Human Resources ("HR"), before the conduct "becomes severe or pervasive" (Def. Ex. C at 2.) According to the policy, after a complaint is made, a subsequent investigation will ensue, which includes "speaking to the alleged harasser and complainant, along with any witnesses." (Def. Ex. C at 3.) After the investigation, HR is to notify the complainant that the investigation concluded, and what action was taken as a

result. Def SMF ¶ 32.) Employees who engage in harassment are disciplined and may be terminated. (Def. SMF ¶ 28.)

Defendant informs all its employees about the policy and they must sign off on it. (Def. SMF ¶ 34.) Accordingly, Plaintiff was aware of and received a copy of this policy, and further "signed acknowledgement." (Def. SMF ¶ 35-36.)

### 2. The Racial Harassment Incident

At the end of Plaintiff's shift, on March 12, 2015, as Plaintiff, her coworker Tanisha Williams ("Williams"), and Hankins were getting ready to go home and during a break time, Plaintiff and Williams were engaged in conversation when Hankins approached the two and interrupted their conversation. (Pl. Dep. at 44:1-44:12; Tuccillo Dep. at 62:4-10.) Plaintiff testified that Hankins interrupted saying something in the nature of, "You're cute"; Plaintiff did not respond. (Pl. Dep. at 44:13-44:17.) Hankins repeated himself but added an additional thought: "[O]h, you're a cute little nigglet." Id. at 44:19-44:20. Plaintiff asked Hankins, "What is that supposed to mean?" and Hankins responded, "You know how pigs are cute, like a pig nigger." Id. at 44:21-45:1. Tanisha was present for this conversation (Pl. SMF ¶ 49; Tuccillo Dep. at 59:24-53:16), and subsequently confirmed that Hankins called Plaintiff a "niglet." (Pl. Ex. L. at 2.)

Plaintiff did not say anything else to Hankins. She walked away and went home. (Pl. Dep. at 45:2-45:5.) Plaintiff and Hankins may have been sitting only "a table or two apart" when the comment was made. (Tuccillo Dep. at 62:4-10.)

After Plaintiff went home, she "couldn't go to sleep" and called Wilson, her supervisor, that same morning to report what Hankins had said. (Pl. Dep. 45:8-45:14.) Wilson told Plaintiff "that it was above his pay grade and [she] needed to take it to HR." Id. at 45:15-45:16. Plaintiff stayed up, waiting for someone from HR to be in the office, and called HR that same morning. Id. at 47:18-47:23; Def. SMF ¶ 9; Pl. SMF ¶ 56. Plaintiff spoke with Jessica Rivera in HR and specifically notified her that this comment was racial and offensive to her. (Pl. Ex. L at 1.) She also reported Williams as a witness to the incident, and HR notified Plaintiff it would be commencing an investigation into the matter. Id.

### 3. Defendant's Investigation of the Racial Comment

Defendant' Director of HR, Jackie Tuccillo ("Tuccillo"), approved Plaintiff's absence from work for the two days immediately following Hankins comment while it investigated the incident. (Def. SMF ¶ 10.) Rivera advised Plaintiff of this when Plaintiff first notified HR on March 11, saying that "while they were looking into what happened, that [Plaintiff] didn't have to

come in and they would let [her] know what was going on." (Pl.
Dep. at 50:7-50:10.) Plaintiff was not paid for those two days.
Id. at 50:14-50:20.

As part of the investigation, HR contacted Williams to
question her about the incident she witnessed. (Pl. Ex. L at 1.)
Without prompting, Williams indicated that she knew what HR was
referring to, stating, "[Y]es, Chris!" Id. Williams explained
that Hankins was initially saying "some sexual remark or joke
to" Plaintiff when he said he had a "funny joke for ya'll." Id.
at 2. According to Williams, Hankins proceeded by stating "you
know how you see a pig and you say pig[l]et?! I can't say the
'N' word so I'm gonna say little niglet." (Id. at 2.) Williams
stated that she heard Plaintiff say, "What," but nothing after
that. Id. Williams additionally provided further information
about Hankins' behavior with other employees, where she heard
him speak "inappropriately on several occasions." Id. According
to Tanisha, Hankins was "constantly referring to females as
bitches and [wa]s always using foul and inappropriate language."
Id.

During this investigation, HR also contacted Hankins
personally. Id. When HR informed him that the call was in
reference to a formal complaint mentioning him, his immediate
understanding was that it regarded a sexual joke about a sex
position, that he repeated in the presence of two female

employees (not Plaintiff and Williams). Id. HR explained that such a comment was "inappropriate . . . and not tolerated," and proceeded to ask if he made any racial comments. Id. Hankins continuously denied the claim that "he ever ma[de] any racial comment or joke," but described medications he took and how he sometimes could not remember things. Id. Hankins was notified he would be suspended pending investigation and was instructed that he not return to work, until notified. Id. Rivera ultimately recommended that Hankins be suspended for "3-5 days" as well as that he "be placed on a final warning." Id. at 3.

Defendant suspended Hankins from work for three days and issued a "final warning that further inappropriate conduct would lead to discipline, including potential termination." (Def. SMF ¶ 11.) Defendant reiterated its policy to Hankins, making clear that using the term "nigglet" is a violation of such. (Def. SMF ¶ 11; Tuccillo Dep. 12:4-7; Pl. Ex. I.)

### 4. Plaintiff's Return to Work

When Plaintiff had not heard back from HR, she called on March 15 and was informed that Hankins had admitted to making the remark and that they "took care of everything." Id. at 50:1-24-51:4. Plaintiff understood this to mean Hankins had been terminated. Id. at 51.

Plaintiff returned to work on the evening of March 15, 2015, and no inappropriate conduct or comments occurred on that day as Hankins was still suspended. (Def. SMF ¶ 14-15.) Wilson informed Plaintiff Hankins was still employed with Defendant. Plaintiff "felt it was unfair" but Wilson explained she would have to talk to HR about that. (Pl. Dep. at 55:11-23.) According to Plaintiff, when she contacted HR the next day, Tuccillo "basically said due to their policies that she did what she had to do." Id. at 56:13-56:19. Plaintiff characterized Tuccillo's tone as "very rude." Id. at 57:21.

In either the same conversation or a different conversation with Tuccillo shortly thereafter, Plaintiff reiterated to Tuccillo (as she had previously stated to Tuccillo, id. at 56:16-17, and to Rivera, id. at 50:6-7) that she was uncomfortable, and asked if either she or Hankins could be placed on a different shift, but Tuccillo simply kept repeating that "she reached out to someone and they told her that they did what they had to do." Id. at 59:3-9.

Defendants state that it had "no positions available for Plaintiff or Hankins to move to," while Plaintiff maintains that "HR never checked to see if anyone could change shifts." (Def. SMF ¶ 13; Pl. Resp. SMF ¶ 13.) Tuccillo testified that she did

not contact other employees asking if they were willing to change shifts. (Tuccillo Dep. at 54:9-13.)

According to Plaintiff, Defendant wanted to have her "work side by side with [Hankins.]" (Pl. Resp. SMF ¶ 18; Pl. Dep. at 65:1-9.) But Defendant states Tuccillo informed Plaintiff she "would not be working in the same area as Hankins." (Def. SMF ¶ 18.) Plaintiff disputes this, citing HR notes that reflect HR recording Plaintiff as having said "that she doesn't think its right and he's still in the same place as her. Even if he doesn't talk to her any more, she doesn't think that's the right thing for us to do. I told her that was our decision and that we needed her to return to work or resign." [Docket Item 28-2 at 20, citing Pl. Ex. L). However, under Defendant's proposed plan, the separation of Plaintiff and Hankins would not have extended to the common breakroom which they would share, nor the shared outside areas. (Tuccillo Dep. at 50:20-51:4.)

Plaintiff, due to her discomfort with Hankins, called out of work after March 15, as she could no longer work with Hankins. (Def. SMF ¶ 20; Pl. Resp. SMF ¶ 20; Pl. Dep. at 59:3-14.) Defendant informed Plaintiff she needed to come to work. (Def. SMF ¶ 21.) Subsequently, on March 17, 2015, "Plaintiff informed Tuccillo that she would be contacting an attorney." (Def. SMF ¶ 22.)

Tuccillo continued to contact Plaintiff with regard to returning to work, informing Plaintiff that if she failed to do so it would be considered a voluntary resignation. (Def. SMF ¶ 24.) Plaintiff alleges that she was unable to return because of "the hostile work environment" and told Defendant she "would not resign." (Pl. Resp. SMF ¶ 25; Pl. Ex. L.) On March 20, 2015, Plaintiff emailed Tuccillo "as a last alternative" expressing that she did not want to lose her job but felt that she should not "have to come to work in these conditions." (Pl. Ex. O.) She claimed that "I hope I can return to work soon without being forced to work side by side with someone who has a problem with me because of the color of my skin." Plaintiff did not return to work after her initial day back on March 15, 2015. (Pl. Dep. at 63:9-14.) At no time after the initial incident did Plaintiff and Hankins work together again. Defendant informed Plaintiff that she would be terminated if she did not return to work and Plaintiff ultimately was so terminated. (Def. SMF ¶ 25.)

Following Plaintiff's termination, on April 23, 2015, one of Defendant's employees, Anthony Debiase, sent an email to Tuccillo regarding Hankins. (Pl. Ex. J.) The email described Hankins's inappropriate behavior towards one of the security guards on two occasions. Id. Additionally, the email stated Hankins was "still finding ways to antagonize and create animosity," reiterating the disruption Hankins's behavior causes

in the warehouse. Id. Ultimately, Defendants fired Hankins effective April 27, 2015. [Tuccillo Dep. at 66:3-8.] Plaintiff contends that this continued harassing behavior by Hankins shows that Defendant's proposed remedial plan (and its suspension of Hankins) was not reasonably calculated to adequately address Plaintiff's complaint. [Docket Item 28-2 at 21.]

In early May 2015, Plaintiff's position remained open and Defendants offered the position back to her. (Pl. Dep. at 81:2-22.) Plaintiff turned down the offer because she "had another job and . . . [because of] what I just went through and the way I was treated there." Id. Plaintiff testified that her new position (working at Domino's for $3 an hour, with the possibility of receiving tips ranging from $25 to $100 for an eight- to ten-hour shift) was preferable to returning to her old position, notwithstanding that she hadn't actually begun working at Domino's yet. Id. at 83:17-84:8. Plaintiff testified that, at the time Defendant offered Plaintiff her old position again, she does not remember "it being discussed if [Hankins] was [still] working there or not." Id. at 86:1-8.[1] It is undisputed that

---

[1] A reasonable finder of fact may find that Plaintiff's refusal to return to work with Defendant effected a refusal of an offer of reinstatement, which may limit the availability of equitable remedies like reinstatement, front pay in lieu of reinstatement, or back pay beyond this date. See generally Maxfield v. Sinclair Intern, 766 F.2d 788, 796 (3d Cir. 1985)("Ordinarily, an employee would be made whole by a backpay award coupled with an order for reinstatement. Reinstatement is the preferred remedy

Hankins was no longer employed when Defendant offered Plaintiff re-employment.

## B. Procedural Background

Plaintiff initially filed suit against Defendants in the Superior Court of New Jersey, Burlington County, Law Division on January 29, 2016, and Defendants removed the action to this Court pursuant to 28 U.S.C. § 1441 et seq. on April 27, 2016. [Docket Item 1.] Plaintiff filed an Amended Complaint. [Docket Item 5.] Defendants then filed a motion to dismiss all claims pursuant to Fed. R. Civ. P. 12(b)(6). [Docket Item 8.] That motion was denied in part and granted in part without prejudice and an accompanying order was issued by this Court. [Docket Items 16, 17.] Plaintiff subsequently filed a Second Amended Complaint [Docket Item 20] and Defendants filed an Answer [Docket Item 21]. In due course, after completion of discovery, Defendants filed the instant motion for summary judgment. [Docket Item 25.] Plaintiff filed a response [Docket Item 28] and Defendants submitted a Reply. [Docket Item 31.]

## III. STANDARD OF REVIEW

Pursuant to Fed. R. Civ. P. 56(c), a motion for summary judgment will be granted if the pleadings, depositions, answers

---

to avoid future lost earnings, but reinstatement may not be feasible in all cases").

to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "[S]ummary judgment may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party." Miller v. Ind. Hosp., 843 F.2d 139, 143 (3d Cir. 1988). All facts and inferences must be construed in the light most favorable to the non-moving party. Peters v. Del. River Port Auth., 16 F.3d 1346, 1349 (3d Cir. 1994).

In deciding a motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. Credibility determinations are the province of the factfinder, and thus at the summary judgment stage credibility issues should be resolved against the moving party. Big Apple BMW v, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992); Meyer v. Riegel Prods. Corp., 720 F.2d 303, 307 n.2 (3d Cir. 1983). However, "[t]he mere existence of a scintilla of evidence," without more, will not give rise to a genuine dispute for trial. Anderson, 477 U.S. at 252. In the face of such evidence, summary judgment is still appropriate

"[w]here the record ... could not lead a rational trier of fact to find for the nonmoving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## IV. ANALYSIS

### A. Racial Harassment Claim: Hostile Work Environment

#### 1. Evidence of Severe or Pervasive Conduct

Defendant argues that Plaintiff's claim of racial harassment should fail as a matter of law because she cannot show the harassment was severe or pervasive as required to establish a prima facie case under NJLAD. The Court disagrees and finds that a reasonable finder of fact could (but need not) conclude that the harassment to which Plaintiff was subjected was severe.

The NJLAD is a "remedial" statute, containing "broad language" to be used "as a mechanism to root out the cancer of discrimination." Cicchetti v. Morris Cty. Sheriff's Office, 194 N.J. 563, 588 (2008)(citations omitted). Section 10:5-12(a) of the NJLAD provides in pertinent part that it is unlawful for an employer to discriminate against an individual because of that person's race. N.J.S.A. § 10:5-12(a). To succeed on a racial harassment claim based upon a hostile work environment, Plaintiff must establish that the complained-of conduct "(1) would not have occurred but for the employee's [race]; and [the conduct] was (2) severe or pervasive enough to make a (3)

reasonable [African-American] believe that (4) the conditions of employment are altered and the working environment is hostile or abusive.'" Taylor v. Metzger, 152 N.J. 490, 498 (1998)(quoting Lehmann v. Toys R Us, Inc., 132 N.J. 587, 603-04 (1993)(modifications in original).[2]

As the New Jersey Supreme Court has stated: "The Court in Lehmann specifically adopted the 'severe or pervasive' test as part of its comprehensive standard. That test conforms to the standard for establishing workplace racial or gender harassment under federal Title VII law. See Meritor Sav. Bank v. Vinson, 477 U.S. 57, 67 (1986) . . . . In choosing its test, the Court clearly rejected an alternative regular-and-pervasive test that requires repetitive or recurrent acts to establish workplace harassment; that test would bar harassment-discrimination actions that were 'based on a single, extremely severe incident.' Lehmann, supra, 132 N.J. at 606. Consequently, under the chosen standard--severe or pervasive conduct--one incident of harassing conduct can create a hostile work environment." Taylor, 152 N.J. at 498-99.

---

[2] The claim for a hostile work environment under NJLAD is "strikingly similar" to one under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, et seq. Caver v. City of Trenton, 420 F.3d 243, 262 (3d Cir. 2005); see also Grazioli v. Genuine Parts Co., 409 F. Supp. 2d 569, 576 n.10 (D.N.J. 2005)(same).

The _Taylor_ Court painstakingly addressed the landscape of the case law in 1998 regarding the viability of hostile-work-environment claims premised on single incidents, looking both to federal district and circuit courts interpreting Title VII claims, as well as state law cases. _Id._ at 499-501. The court concluded that "a single utterance of an epithet can, under particular circumstances, create a hostile work environment[,]" stating that "there is no requirement that harassment occur more than one time in order to be actionable. The standard contemplates conduct that is either severe or pervasive. Although the conduct may be both, only one of the qualities must be proved in order to prevail. The severity of the conduct may vary inversely with its pervasiveness. Whether the conduct is so severe as to cause the environment to become hostile or abusive can be determined only by considering all the circumstances, and this determination is left to the trier of fact.'" _Id._ at 501-02 (quoting _Nadeau v. Rainbow Rugs, Inc._, 675 A.2d 973, 976 (Sup. Jud. Ct. Me. 1996))(emphasis added).

The Third Circuit has recently reiterated that the disjunctive standard ("severe OR pervasive") is the correct standard in a Title VII case. In determining whether a hostile environment exists, the correct standard asks whether the conduct was "severe or pervasive," meaning that "'severity' and 'pervasiveness' are alternative possibilities." _Castleberry v._

STI Grp., 863 F.3d 259, 264 (3d Cir. 2017). Cf. Exantus v.
Harbor Bar & Brasserie Restaurant, 386 F. App'x 352, 354 (3d
Cir. 2010)(summary judgment appropriate because "incidents
appear to have been isolated, rather than pervasive and
severe")(emphasis added). Therefore, courts must examine the
totality of the circumstances in assessing whether the conduct
was either severe or pervasive, including but not limited to:
"the frequency of the discriminatory conduct; its severity;
whether it is physically threatening or humiliating, or a mere
offensive utterance, and whether it unreasonably interferes with
an employee's work performance." Mandel v. M & Q Packaging
Corp., 706 F.3d 157, 168 (3d Cir. 2013) (quoting Harris v.
Forklift Sys., Inc., 510 U.S. 17, 23 (1993)).

Here, Defendants first argue that Plaintiff fails to put
forth sufficient evidence that a single racially-insensitive
remark, from a single incident, rises to the standard of severe
or pervasive conduct as part of a hostile work environment
claim. [Docket Item 21 at 7-8.] Here, it is undisputed that on
March 11, 2015, Plaintiff's co-worker, Hankins, called Plaintiff
a "niglet." Defendant concedes that this remark is vulgar,
offensive, and insensitive. Plaintiff contends that an
examination of the totality of the circumstances would permit a
reasonable jury to conclude this "March 12 incident constitutes
harassment in violation of NJLAD creating a hostile work

environment." [Docket Item 28 at 13.] Plaintiff essentially argues that Hankins was an abusive co-worker who called her a contraction of the N-word and pig, and who was abusive toward her as a woman, all in a context of Plaintiff being required to continue to work with him without corrective measures. However, Defendants argue, this Court should determine that no reasonable finder of fact could conclude that this incident constituted "severe" harassment, as a matter of law.

Under the NJLAD, "conduct must be extreme to amount to a change in the terms and conditions of employment." Heitzman v. Monmouth Cty., 321 N.J. Super. 133, 147 (App. Div. 1999)(overruled on other grounds), quoting Faragher, 524 U.S. at 788. Therefore, harassing conduct must be severe or pervasive. Lehmann, 132 N.J. at 606 ("The disjunctive 'severe or pervasive' standard is in conformity with federal Title VII law."). Such conduct may be distinguishable from the "mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee." Meritor, 477 U.S. at 67. The Court in Faragher reiterated that Title VII's standards, "[p]roperly applied, . . . will filter out complaints 'attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing[,]'" and cited with approval a collection of cases "instructing that '[d]iscourtesy or rudeness should not be

confused with racial harassment' and that 'a lack of racial sensitivity does not, alone, amount to actionable harassment.'" Id. at 788 (internal citations omitted). Accordingly, "'simple teasing,' offhand comments, and isolated incidents (unless extremely serious)" are not sufficient. Faragher, 524 U.S. at 788 (internal citation omitted).[3]

Per the parenthetical, then, in Faragher, the question presented to this Court is whether the Court ought to rule that any potential finding by a factfinder, taking into account all the circumstances, that the incident with Hankins ought to be categorized as "extremely serious" (and therefore "severe" under NJLAD) would be unreasonable, as a matter of law.

The Court declines this invitation to limit the scope of how a reasonable finder of fact--notably, not this Court at summary judgment--may interpret and weigh this incident and the testimony that establishes it. As Judge Kavanaugh stated in Ayissi-Etoh v. Fannie Mae, 712 F.3d 572, 580 (D.C. Cir. 2013), "several courts have recognized, moreover, [that] a single verbal (or visual) incident can likewise be sufficiently severe to justify a finding of a hostile work environment. . . . It may

---

[3] While this is the general rule, the New Jersey Supreme Court has repeatedly and expressly recognized that "[n]onetheless, in certain circumstances, even a single comment can be so severe as to pollute the work environment, rendering it irretrievably hostile. See Taylor, supra, 152 N.J. at 495, 499, 502[.])." Cutler v. Dorn, 196 N.J. 419, 432 n.7 (2008).

be difficult to fully catalogue the various verbal insults and epithets that by themselves could create a hostile work environment."

"Niglet," as Hankins explained to Plaintiff, is a portmanteau of the word "nigger" and the word "piglet."

The Court expresses its sincere hope that little need be said to establish the objective offensiveness, and the severity of that offense, of the word "nigger."[4]

---

[4] "If you could choose one word to represent the centuries of bondage, the decades of terrorism, the long days of mass rape, the totality of white violence that birthed the black race in America, it would be 'nigger.'" Ta-Nehisi Coates, In Defense of a Loaded Word, N.Y. Times, Nov. 24, 2013, https://www.nytimes.com/2013/11/24/opinion/sunday/coates-in-defense-of-a-loaded-word.html. See also Ayissi-Etoh, 712 F.3d at 580 (Kavanaugh, J., concurring)("[T]he n-word . . . has been labeled, variously, a term that 'sums up . . . all the bitter years of insult and struggle in America,' LANGSTON HUGHES, THE BIG SEA 269 (2d ed.1993)(1940), 'pure anathema to African-Americans,' Spriggs v. Diamond Auto Glass, 242 F.3d 179, 185 (4th Cir. 2001), and 'probably the most offensive word in English,' RANDOM HOUSE WEBSTER'S COLLEGE DICTIONARY 894 (2d rev. ed.2000). See generally ALEX HALEY, ROOTS (1976); HARPER LEE, TO KILL A MOCKINGBIRD (1960). . . . No other word in the English language so powerfully or instantly calls to mind our country's long and brutal struggle to overcome racism and discrimination against African-Americans."); Taylor, 152 N.J. at 502 ("Racial epithets are regarded as especially egregious and capable of engendering a severe impact. . . . In this case, defendant's remark had an unambiguously demeaning racial message that a rational factfinder could conclude was sufficiently severe to contribute materially to the creation of a hostile work environment. The term defendant used, 'jungle bunny,' is patently a racist slur, and is ugly, stark and raw in its opprobrious connotation. . . . It is a slur that, in and of itself, is capable of contaminating the workplace."); Reid v. O'Leary, No. 96-401, 1996 WL 411494, at *4 (D.D.C. July 15, 1996)("while it may be true that a single incident, without more, usually does not create a hostile work

"Piglet," of course, is the word for young pig. "Pigs are taboo creatures, and as metaphors they imply that a person is repulsive and morally depraved. . . . [T]he metaphor's offensiveness primarily reflects a transfer of dislike from the animal to the person[.]" Nick Haslam, Steve Loughnan, and Pamela Sun, Beastly: What Makes Animal Metaphors Offensive?, 30 J. Language & Soc. Psychol. 311, 322 (2011).[5] Pigs, notwithstanding their actual habits, abilities, or attributes, are commonly associated with negative concepts: uncleanliness (e.g., of the pigsty, the barnyard, or as a forbidden, "unclean" food),

---

environment, it is very possible that the term 'Coon-Ass' is racially derogatory or severe enough, in and of itself, to create a hostile work environment. That question, of course, is properly decided by a jury, not the court.")(internal citations omitted).

[5] In one study, participants associated pigs and hogs (when used metaphorically to describe people) with "low conscientiousness" (alongside sloths, slugs, and the general "animal") and "depravity" (along with "animal, beast, dog, . . . leech, . . . rat, toad, vulture, whale, [and] worm[.]" Haslam, supra, at 316. Another study found that participants rated comparing a person to a pig as more offensive than comparing a person to an ape or a rat. Id. at 320.

slovenliness, or gluttony.[6] Moreover, pigs are undoubtedly

considered to be less than humans.[7]

Moreover, the "piglet" aspect of Hankins's racial slur

casts Plaintiff in a diminutive, and therefore potentially

---

[6] See, e.g., Robert Sommer and Barbara A. Sommer, Zoomorphy: Animal Metaphors for Human Personality, 24 Anthrozoös 237, 240 (2011)(in study of 36 mammal metaphors, 100% of subjects stated being called a pig was "uncomplimentary," representing both highest level of agreement among subjects, as well as most negative association, among all mammal metaphors); Luca Andrighetto, Paolo Riva, Alessandro Gabbiadini, and Chiara Volpato, Excluded from all Humanity: Animal Metaphors Exacerbate the Consequences of Social Exclusion, 35 J. Language and Soc. Psychol. 628, *5 (2016)("Animal metaphors occur repeatedly in human speech and convey a multiplicity of meanings and feelings that strongly depends on the context and the target of the reference. For example, the metaphorical use of 'piglet' assumes a benevolent and funny connotation in a familiar context when referring to our own children, but may become offensive and degrading in a romantic relationship. Regardless of context, recent evidence has suggested that animal metaphors become offensive when they involve animals that conjure up feelings of disgust (e.g., worm) or degradation (e.g., ape). Throughout history, these animal images have been often used in conjunction with social exclusion to prepare the ground for aggression and collective violence.")(internal citations omitted).

[7] "Like so many of us, [John Stuart] Mill[, when he remarked that it is better to be a dissatisfied human than a satisfied pig,] couldn't manage to liberate himself from the notion that pigs are beneath us in the cosmic order." David Livingstone Smith, Less Than Human: Why We Demean, Enslave, and Exterminate Others 41-42 (2012). The Court further notes that a reasonable finder of fact could conclude that "[t]he same animal expression may be more offensive when expressed toward an out-group member than an in-group member[.]" Haslam et al., supra, at 314. While "likening people to animals is not invariably dehumanizing," as "calling one's baby 'piglet' is not the same as angrily calling someone an 'ape'[,]" id. at 313, the Court is unwilling to state, let alone rule as a matter of law, that Hankins's comment to Plaintiff falls more into the former category rather than the latter.

demeaning, light; this is relevant here, especially, because Hankins made this comment to Plaintiff in the course of directing a sexually-charged remark at her. The Court notes that Hankins's comment to Plaintiff did not arise in a way that was perceived by Plaintiff as jocular or collegial, and the Court is unwilling to say that her perception was unreasonable as a matter of law. A reasonable factfinder would be readily capable of concluding that this was far from the "simple teasing" not actionable under Title VII, as discussed in <u>Oncale v. Sundowner Offshore Servs., Inc.</u>, 523 U.S. 75, 82 (1998) and <u>Faragher</u>. Defendant may argue that Hankins intended his remark to be taken as a joke, but does not dispute that it was offensive. Regardless, the severity of Hankins's remark will be a question for the finder of fact to resolve at trial, and not for this Court on summary judgment.

Hankins's comment to Plaintiff also was <u>directed</u> at Plaintiff--the term was not one that Hankins used in passing to refer to some other person, object, or situation (as offensive as that might nevertheless have been). Plaintiff has testified that Hankins <u>called her</u> the word in question. It is difficult to conclude that such a remark could, therefore, be appropriately characterized as "stray" or "offhand" which connote a <u>lack</u> of directness avowedly not present here. Cf. <u>Caver</u>, 420 F.3d at 262 ("'offhanded comments and isolated incidents (unless extremely

serious)' are not sufficient to sustain a hostile work environment claim." <u>Faragher</u>, 524 U.S. [at] 788"); <u>Ezold v. Wold, Block, Schorr and Solis-Cohen</u>, 983 F.2d 509, 545 (3d Cir. 1992)("[s]tray remarks by nondecisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight . . . ."); <u>Park v. Sec'y U.S. Dep't of Vets. Affairs</u>, 594 F. App'x 747, 751 (3d Cir. 2014)(plaintiff's one valid complaint of supervisor making offensive, inappropriate comment based on plaintiff's national origin "was a classic stray comment and is insufficient to establish a hostile work environment").

The comment was made to Plaintiff in front of another employee, Williams, who confirmed without delay to Defendant that the offending epithet was used.[8] A reasonable finder of fact could conclude that this was humiliating to Plaintiff.

---

[8] Williams also subsequently informed Defendant that Hankins referred to her as "bitch" and constantly referred to female employees as such. (Pl. Ex. L at 2.) Plaintiff also complained to Wilson about Hankins "a number of times" stating he was "erratic" and questioning his employment with Defendant, although she never discussed any specific comments. (Def. SMF ¶ 7; Pl. SMF ¶ 53; Pl. Dep. 74:21-22.) Although evidence suggests that Hankins's behavior was generally inappropriate, the present record reflects that Defendant did not receive a formal complaint about Hankins until Plaintiff's complaint in March 2015. (Def. SMF ¶ 6; Tuccillo Dep. at 45:18-46:3.)

The law requires a reasonable employer to take "prompt remedial action" when a hostile environment "is discovered," not only after "the harassed employee makes a complaint" in order to escape liability. <u>Harley v. McCoach</u>, 928 F. Supp. 533, 540 (E.D.Pa. 1996)(citing <u>Bouton v. BMW of N. Am., Inc.</u>, 29 F.3d 103, 110 (3d Cir. 1994)(employer must take "prompt remedial

After assessing the totality of the circumstances, the
Court concludes that a factfinder's conclusion that this remark
was severe, humiliating, and unreasonably interfered with
Plaintiff's ability to work with Hankins on the same shift would
be a reasonable one. See Taylor, 152 N.J. at 508 ("A rational
factfinder, crediting plaintiff's evidence, could conclude that
defendant engaged in discriminatory harassment by uttering a
racial epithet that was sufficiently severe to have created a
hostile work environment. We reverse the order of summary
judgment for defendant on the claim of LAD racial discrimination
based on workplace harassment.").

The Court notes that other courts have held that a single
incident involving a racial epithet used by a coworker is not
actionable under this standard. See, e.g., Bolden v. PRC Inc.,
43 F.3d 545, 551 (10th Cir. 1994)("The blatant racial harassment
of Mr. Bolden came from only two of his coworkers on a couple of
occasions. . . . Because the racial comments were not pervasive,
they are insufficient to be actionable.[9]"); Johnson v. Bunny

---

action when the hostile environment is discovered" (emphasis
omitted))).

[9] The Court notes that, in this formulation, the Tenth Circuit
appears to assume, without explicitly stating, that "the racial
comments" were also not "severe." Moreover, the court required
the plaintiff to present evidence of "a steady barrage of
opprobrious racial comment," citing Hicks v. Gates Rubber Co.,
833 F.2d 1406, 1412-13 (10th Cir. 1987). The Court does not
understand NJLAD claims (nor the Third Circuit on Title VII

<u>Bread Co.</u>, 646 F.2d 1250, 1257 (8th Cir. 1981)("We find no steady barrage of opprobrious racial comment. The use, if any, of racial terms was infrequent, was limited to casual conversation among employees, and with possible rare exceptions was not directed toward appellants."); <u>Bivins v. Jeffers Vet Supply</u>, 873 F. Supp. 1500, 1508 (M.D. Ala. 1994)(plaintiff failed to show that harassment "was 'sufficiently pervasive so as to alter the conditions of employment[,]'" quoting <u>Harris</u>, 510 U.S. at 21[10], and ruling that one use of the word "nigger" by a coworker was "a [non-actionable] 'mere utterance of an . . . epithet which engenders offensive feelings'" and the defendants "unequivocally" "addressed the situation promptly and efficiently"); <u>Bennett v. N.Y.C. Dep't of Corrs.</u>, 705 F. Supp. 979, 983 (S.D.N.Y. 1989)(plaintiff failed to put forth evidence allowing for a finding that "there was a pattern of enmity" directed at black employees because plaintiff's "evidence . . .

claims, <u>see</u> <u>Castleberry</u>) to require the showing of such a "barrage."

[10] The <u>Bivins</u> Court appears to have paraphrased <u>Harris</u> rather than directly quoted it, as the full quote from <u>Harris</u> states: "When the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently <u>severe or</u> pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." <u>Id.</u> at 21 (internal citations omitted; emphasis added). The <u>Bivins</u> court also alternately named two different coworkers as having made the single offending comment. 873 F. Supp. at 1506 (Brown used epithet); <u>id.</u> at 1508 (Cook used epithet).

consists of one incident"). However, it does not appear to this Court that these courts, in the main, were assessing the work environment on severity rather than pervasiveness. As such, they are of limited utility.

The Third Circuit has suggested that, where "an extremely derogatory 'single utterance' [of an epithet]" is "directed at the plaintiff," such an instance may create a hostile work environment under NJLAD. <u>Caver</u>, 420 F.3d at 263 n.15. And, more recently, the Third Circuit has reiterated that a single incident may suffice under Title VII as well if sufficiently severe, i.e., "extremely serious". <u>Castleberry</u>, 863 F.3d at 264 ("it is clear that one [isolated] incident can suffice to state a claim" as "isolated incidents will amount to harassment if extremely serious")(internal quotations and citations omitted); <u>id.</u> at 265 (collecting cases).

As in <u>Castleberry</u>, other instances where summary judgment have been granted are inapposite to these factual allegations. <u>Id.</u> at 265 (comparing facts with <u>Clark Cty. Sch. Dist. v. Breeden</u>, 532 U.S. 268 (2001)(per curiam); <u>King v. City of Phila.</u>, 66 F. App'x 300, 303 (3d Cir. 2003); <u>Miller v. Thomas Jefferson Univ. Hosp.</u>, 565 F. App'x 88 (3d Cir. 2014); <u>Al-Salem v. Bucks Ct. Water & Sewer Auth.</u>, No. 97-6843, 1999 WL 167729, at *5-*8 (E.D.Pa. 1999); and finding "the facts of those cases" "unhelpful"). While the court in <u>Castleberry</u> assessed a

purportedly isolated incident involving a supervisor's "use[ of]
a racially charged slur in front of [the plaintiffs] and their
non-African-American coworkers" within "the same breath" as
"threats of termination (which ultimately occurred)" and found
that to "constitute[] severe conduct that could create a hostile
work environment," the Castleberry court did not designate this
as a floor of severity, but rather merely held that it was,
contrary to the District Court's conclusion, actionable under
§ 1981. Id. at 263-66.[11]

---

[11] See also Oakley v. Wianecki, 345 N.J. Super. 194, 197, 202
(App. Div. 2001)(granting summary judgment in reverse
discrimination case where, unlike in Taylor, the "single
utterance" at issue (an unnamed "coarse, insulting and sexually
explicit insult") "was undoubtedly ugly and offensive, [but] did
not carry the connotation of inferiority inherent in the epithet
used in Taylor [i.e., 'jungle bunny'] or any comparable
connotation. It was an expression of anger, and was uttered in
the context of an angry exchange between plaintiff and Owens,
and for all that appears, was not significantly different from
what Owens might have aimed at another male or an African
American woman in a similar situation."); Jones v. Norton, No.
06-2924, 2008 WL 282251, at *1, *4 (E.D.Pa. Jan. 31,
2008)(summary judgment granted where co-worker, in unrelated
"angry" "outburst[,]" called plaintiff a "'black son of a
bitch,' and a 'black motherfucker[,]' [and plaintiff] also
believe[d coworker] called him a nigger . . . but did not hear
the word clearly" because plaintiff did not show "a steady
barrage of opprobrious racial comments[,]" or that
"discrimination was pervasive or regular[,]" citing Boyer v.
Johnson Matthey, Inc., No. 02-8382, 2005 WL 35893, at *17
(E.D.Pa. Jan. 6, 2005)(finding that plaintiff did not show
"harassment was regular and pervasive" where there was no
"steady barrage of opprobrious racial comments") and Al-Salem,
1999 WL 167729 at *5, citing Schwapp v. Town of Avon, 118 F.3d
106, 110-11 (2d Cir. 1997)(no "steady barrage of opprobrious
racial comments" means harassment is not "severe and
pervasive")(emphasis added)); Ballard v. Mercy Catholic Med.

<u>Ctr. of Southeastern Pa.</u>, No. 12-0779, 2013 WL 3305235, at *8
(E.D.Pa. June 28, 2013)(plaintiff's claim for racial harassment
fails where coworker addressed plaintiff by the 'n' word in the
Mercy cafeteria" because one such incident "is insufficient to
demonstrate <u>pervasive and regular</u> discrimination, as is required
to make out a prima facie case of a hostile
environment")(emphasis added); <u>Lawrence v. F.C. Kerbeck & Sons</u>,
134 F. App'x 570, 572 (3d Cir. 2005)(acting manager responsible
for calculating payroll made a "racial remark" in context of an
argument with plaintiff; summary judgment appropriate where
plaintiff "acknowledged that he did not have regular contact
with Martin and that the altercation over the payroll was an
isolated incident"); <u>Shaw v. FedEx Corp.</u>, No. L-3351-08, 2012 WL
3116722, at *6 (N.J. App. Div. July 20, 2012)(distinguishing
<u>Taylor</u> from situation where plaintiff "continued a voluntary
friendship with [offending coworker] over the next three
years[,] demonstrate[ing] that plaintiff did not consider [her]
objectionable conduct to be severe or pervasive or that she felt
unsafe or perceived that [she] had altered the work conditions"
and both plaintiff and offender "exchanged racially charged
insults"); <u>Shain v. HEL Ltd.</u>, No. L-2849-08, 2012 WL 671922, at
*5 (no claim for hostile work environment where, <u>inter alia</u>,
offensive comment "was not made directly to plaintiff" and
offender "promptly apologized"); <u>El-Sioufi v. St. Peter's Univ.
Hosp.</u>, 382 N.J. Super. 145, 172 (App. Div. 2005)(no hostile work
environment claim where "single comment" was supervisor stating,
prior to plaintiff's employment, that she "did not want to hire
a Muslim," supervisor "essentially apologized, asked plaintiff
to please put it behind her and told her that she was looking
forward to working together" as court "decline[d] to find that a
single statement made prior to one's employment can support a
subsequent discrimination complaint"); <u>Bagley v. W.J. Maloney
Plumbing</u>, No. CV-12-01901-PHX-SRB, 2014 U.S. Dist. LEXIS 185309,
at *15-*16 (D. Ariz. Feb. 10, 2014)(summary judgment appropriate
where supervisor once repeatedly said "nigger" at plaintiff and
supervisor was reassigned "when [p]laintiff expressed his
reluctance to return to the same jobsite" as supervisor because,
in part, comment was not "announced publicly for other employees
to overhear, evidence which is relevant in determining whether
the unwelcome conduct here was severe[,]" and because Ninth
Circuit purportedly "require[s] a plaintiff to show that the
offending conduct occurred more than once")(citations omitted);
<u>cf. Richmond v. Mississippi Dep't of Hum. Servs.</u>, 745 So.2d 254,
258 (S.Ct. Miss. 1999)(employee's single use of the word
"nigger" "does not rise to the level of creating a hostile
environment" in case where "the person in which the word was

The Court notes Defendant's argument that Hankins's insult may not suffice under NJLAD because he was not Plaintiff's supervisor. While this Court previously distinguished Taylor from the instant case on that ground, Nuness v. Simon and Schuster, Inc., 221 F. Supp. 3d 596, 601-02 (D.N.J. 2016), the Court explicitly stated: "While the insult at issue here was clearly a racist slur and directed at the plaintiff, it was not uttered by a supervisor like in Taylor, but by a co-worker, and there are no facts in the Amended Complaint indicating that any other person was present to hear the remark[,]" and relied on that fact again in holding the Amended Complaint insufficient to state a claim. Id. at 602, 603. That assumption is manifestly no longer the case, and the Court notes that, while the Taylor court apparently "heavily relied" on the supervisor-coworker distinction, Nuness, 221 F. Supp. 3d at 602, Taylor did not expressly require that a single slur, to be actionable, must have been made by a supervisor, and indeed, a close read of the text of that case suggests that the remark itself had independent "severity." Taylor, 152 N.J. at 503 ("the severity of the remark in this case was exacerbated by the fact that it was uttered by a supervisor" (emphasis added)). See also Leonard

used in reference to, seemingly accepted the apology offered" by the offending co-worker "and did not feel it necessary to report the incident to her superiors").

v. Metro. Life Ins. Co., 318 N.J. Super. 337, 345 (App. Div. 1999)("A rational factfinder could conclude that Iacone's [two] comments were severe enough to make a reasonable diabetic believe that the working environment was hostile or abusive. While the comments were not racial slurs, as in Taylor, they could be construed as demeaning plaintiff because of his physical condition and ridiculing his health concerns and fear of death associated with that condition. Further, the severity of the remarks was underscored by the fact that they were uttered by plaintiff's supervisor[.]" (emphasis added)); Hargrave v. Cty. of Atlantic, 262 F. Supp. 2d 393, 416 (D.N.J. 2003)("a jury could reasonably conclude that the impact and severity of Martello's conduct was aggravated by the fact that he was a member of the management staff,")(citing, inter alia, Taylor and Leonard)(emphasis added).

The Court also notes that its previous ruling was premised on the proposition that "the sole defendants[,] . . . the employer and its parent, . . . are sought to be held liable for one remark of a non-supervisory co-worker." Nuness, 221 F. Supp. 3d at 602. In contrast, the Court understands Nuness now to claim that Defendant should be held responsible also for its own negligence in failing to respond adequately to Hankins's behavior, and not merely for the making of the comment itself. On this theory, it is not simply Hankins's comment (which,

admittedly, Defendant could not have controlled or prevented ex
ante, except by having terminated Hankins before he made the
comment) that created the hostile work environment and exposed
Defendant to liability, but that comment in conjunction with the
allegedly inadequate response thereto, for which Defendant can
rightly be held responsible under the NJLAD, if proved.
Similarly to Castleberry, where the court ruled that the
plaintiffs could also have pled a viable claim for pervasiveness
of the racial harassment because of the actual existence of
other incidents connoting racial harassment, 863 F.3d at 265-66,
the Court notes that a reasonable finder of fact could conclude
that Plaintiff is not simply citing the "isolated" incident with
Hankins, but rather that incident as well as Defendant's
allegedly inadequate response thereto, in attempting to
establish that the harassment she was subjected to was
sufficiently severe or pervasive under NJLAD.

In Taylor, the New Jersey Supreme Court recognized that
"[a]n employer has a clear duty not only to take strong and
aggressive measures to prevent invidious harassment, but also to
correct and remediate promptly such conduct when it occurs." 152
N.J. at 504. As will be discussed infra, Plaintiff has put forth
sufficient evidence to allow a reasonable finder of fact to
conclude that Defendant did not take "adequate remedial action"
when informed about Hankins's comment, thereby allowing a

rational factfinder to find for Plaintiff on the question of Defendant's vicarious liability. This alleged failure by Defendant could be seen by the finder of fact as Defendant's contribution to the hostile work environment: "When an employer knows or should know of the harassment and fails to take effective measures to stop it, the employer has joined with the harasser in making the work environment hostile. The employer, by failing to take action, sends the harassed employee the message that the harassment is acceptable and that the management supports the harasser." Lehmann, 132 N.J. at 623.

Here, a reasonable finder of fact could conclude that Defendant's alleged failure to take adequate measures to prevent Hankins from harassing Plaintiff again "sen[t Plaintiff] the message that the harassment [was] acceptable" because it apparently viewed Hankins's behavior as providing lesser grounds for termination than being late or exhibiting subpar work performance; because its proposed remedial plan would not have prevented the same situation from coming about in the first place (as it occurred in a shared space); because Hankins refused to acknowledge or admit what he had done; and because of the suggestion Plaintiff understood that, due to his familial relationships, Hankins was not likely to be (or not going to be) terminated (notwithstanding his eventual firing). This outcome could have contributed to the hostility of the working

environment such that a reasonable person in Plaintiff's position would have experienced it to be so severe as to effect a change in the terms and conditions of her employment: from Plaintiff's perspective, she was subjected to a vile instance of racial harassment with sexual overtones, promptly reported it, and nevertheless remained unprotected (and was, allegedly, spoken to rudely, in a manner that may have led her to believe that Defendant was not open to hearing or addressing her complaint). If Plaintiff succeeds in convincing a jury of these facts and inferences, a rational finder of fact could find that this context amounted to a racially hostile work environment for Plaintiff. A reasonable jury could, to the contrary, conclude that Defendant's remedial steps, such as the three-day suspension of Hankins and eventually firing Hankins and offering to re-employ Plaintiff, were not inadequate to reasonably address the racial harassment. Such a determination will not be made in a summary judgment motion.

Similarly, in Reid, the court noted that in "establishing her claim for hostile work environment, Plaintiff alleges discriminatory treatment beyond the incident" where she was called the racial slur: "namely, insensitive and unconcerned remarks by DOE employees [in response to that incident] that . . . a jury surely could interpret as contributing to a hostile work environment." 1996 WL 411494 at *4. The court found that

the defendant's response to the plaintiff's complaint was material, as a factfinder could conclude that "its response contributed to the allegedly hostile work environment." Id. See also Payton v. N.J. Tpk. Auth., 148 N.J. 524, 536-37 (1997)("the effectiveness of an employer's remedial steps relates to an employee's claim of liability").

After considering the totality of the circumstances, and giving Plaintiff, as the party opposing summary judgment, the benefit of reasonable inferences in her favor, the Court finds that there is a genuine dispute of material fact as to whether the conditions of Plaintiff's working environment were "severe or pervasive" pursuant to NJLAD, and Defendant's request for summary judgment on these grounds is DENIED.

## 2. Evidence of Vicarious Liability

Defendants argue that Plaintiff has not adduced enough facts to allow a reasonable finder of fact to conclude that Defendant is vicariously liable for the conduct of Hankins, its employee and Plaintiff's coworker. [Docket Item 21 at 11.]

Under NJLAD, the New Jersey Supreme Court has "concluded that employers could be vicariously liable in damages under an agency theory for . . . harassment committed by employees, and that such liability would be governed by a variable standard depending on the state of mind of the employer. Employers that were negligent in failing to take effective steps to end . . .

harassment would be liable for compensatory damages, while those that actually participated in or were willfully indifferent to the wrongful conduct would be liable for punitive damages." Payton, 148 N.J. at 536 (citing Lehmann, 132 N.J. at 619-26, internal citations omitted). The court continued: "Of particular importance in Lehmann, we noted that an employer's liability for its own negligence in failing to take effective remedial measures was a form of direct liability in addition to vicarious liability." Payton, 148 N.J. at 536 (citing Lehmann, 132 N.J. at 623). "Thus, we determined that an employer that failed to take effective remedial measures against a harassing employee was, in essence, liable for its own conduct." Payton, 148 N.J. at 536 (emphasis in original).

"Effective measures are those 'reasonably calculated to end the harassment.'" Payton, 148 N.J. at 537 (quoting Lehmann, 132 N.J. at 623). Timeliness of the employer's response is relevant to the determination of effectiveness, as is whether "the employer drags its feet in acting on the corroborative evidence" that may be uncovered by a prompt investigation. Payton, 148 N.J. at 537. The court in Payton noted that "[n]umerous federal courts have adopted this position as well. Federal jurisprudence in this area is particularly relevant because the LAD draws significantly from federal antidiscrimination law." Id. at 538 (internal citations omitted). The court concluded: "In short, a

remedial scheme that reaches the correct result through a process that is unduly prolonged or that unnecessarily and unreasonably leaves the employee exposed to continued hostility in the workplace is an ineffective remedial scheme. Such a process, in reality, indirectly punishes employees with the temerity to complain about . . . harassment and cannot constitute 'effective' remediation." Id.[12]

Here, a rational finder of fact could conclude that Defendant's proposed remedial measure was not adequate because it was not reasonably calculated to end the harassment. Taking the evidence in the light most favorable to Plaintiff, and making all reasonable inferences in her favor, the harassment occurred while she and Hankins were at the end of their shift, in a common area and not on the work floor itself. Defendant's

---

[12] See also Jensen v. Potter, 435 F.3d 444, 452-53 (3d Cir. 2006), rev'd on other grounds ("In order to establish employer negligence [in a coworker harassment case], the plaintiff must show that management knew or should have known about the harassment, but 'failed to take prompt and adequate remedial action.' Andrews [v. City of Phila.], 895 F.2d [1468,] 1486 [(3d Cir. 1990)]. An effective remedy--one that stops the harassment--is adequate per se. Knabe v. Boury Corp., 114 F.3d 407, 411-12 n.8 (3d Cir. 1997). Even if not effective, an employer's remedial measure is nonetheless adequate if 'reasonably calculated' to end the harassment. Id. at 412-13 (internal quotation omitted)."). "[A]n employee cannot dictate that the employer select a certain remedial action[,]" but "Title VII requires . . . that the employer take steps reasonably likely to stop the harassment." Knabe, 114 F.3d at 414 (internal quotation and citation omitted).

proposed remedial measure would only have separated Plaintiff

and Hankins while they were working on the work floor--and not

in the precise location and context where the harassment

occurred in the first place. Furthermore, when Plaintiff

suggested an alternative remedial measure (that either she or

Hankins be moved to a different shift), the evidence allows for

a conclusion that Tuccillo unreasonably failed to implement,

attempt to implement, or even consider this alternative plan.

Cf. Jensen, 435 F. 3d at 447 (supervisor declined to move

plaintiff from alleged harasser's work area "despite the

availability of another workstation. When asked at his

deposition to explain why he did not move [the plaintiff], [the

supervisor] answered: 'Because I didn't.'").

Because there are genuine disputes of material fact about

whether Defendant's response to Plaintiff's complaint was

reasonably calculated to prevent Hankins from harassing

Plaintiff again, the Court cannot state that it was adequate as

a matter of law.[13]

---

[13] See also Amirmokri v. Baltimore Gas & Elec. Co., 60 F.3d 1126,
1131 (4th Cir. 1995)("The adequacy of [defendant]'s response
once it was aware of the harassment is a factual issue. In
Paroline [v. Unisys Corp., 879 F.2d 100, 106-07 (4th Cir.
1989)(rev'd on other grounds)], a Unisys employee was sexually
harassed by a co-worker. When she complained, Unisys launched a
formal investigation, disciplined the harasser, and required him
to seek counseling. The harasser was informed that any further
incidents would be grounds for his immediate termination. We
held that a reasonable factfinder could infer that Unisys

The Court previously held that Plaintiff failed to state a claim on this point, Nuness, 221 F. Supp. 3d at 604, where Plaintiff did "not plead any facts describing Defendants' anti-harassment policy and how it was inadequate." Id. Further development of the factual record has provided the basis for a reasonable finder of fact to find for Plaintiff on this element, however, as Plaintiff has now put forth evidence to show that the proposed remedial plan Defendant propounded under its anti-harassment policy would have exposed Plaintiff to precisely the same conduct, in precisely the same context, from Hankins.

The Court notes that, while the harassment here did end, it did not end because of the measures Defendant took. In order to be "adequate per se" on the grounds that it is "effective," the remedy must be what stops the harassment. Jensen, 435 F.3d at 453. Here, a reasonable finder of fact could conclude that it

---

intended the reprimand to be no more than a slap on the wrist and, therefore, a genuine issue of fact existed about whether Unisys's action was reasonably calculated to end the harassment [thereby insulating it from liability on the hostile-work-environment claim]."); McCloud v. United Parcel Serv., Inc., 328 F. App'x 777, 781 (3d Cir. 2009)("UPS's remedial action was both prompt and adequate" where it investigated within twenty-four hours, interviewed "all eighteen employees who were assigned to the area where the cone [with a racial slur written on it] was found, obtained handwriting samples from each of them, and consulted a handwriting expert to compare the samples with the writing on the cone" and "instructed supervisors to meet with employees to inform them that such an incident was not tolerable" although "no employee was punished because the investigation was inconclusive").

was not Defendant's remedy that stopped the harassment, but rather Plaintiff's decision not to continue to work the same shift as Hankins, as Defendant would have had Hankins and Plaintiff working together again, in precisely the same context as at the time of the first instance, once Hankins had served out his suspension. Accordingly, Defendant may not rely on the fact that the harassment stopped to show that it is entitled to a ruling as a matter of law that its remedial plan was "effective" and therefore "adequate."

Accordingly, Defendant is not entitled to summary judgment on these grounds, and its motion as to Plaintiff's hostile work environment claim is therefore DENIED.

### B. Constructive Discharge

Defendant argues that Plaintiff does not provide evidence that can establish a claim for constructive discharge under the NJLAD because of the nature of the harassment Plaintiff alleges, its company procedures, and the proposition that Plaintiff did not "do all that was necessary to remain employed." [Docket Item 21 at 14-16.]

The question that pervades this argument as well as Defendant's argument as to Plaintiff's retaliation claim, _infra_, is how best to characterize and understand Plaintiff's separation from employment by Defendant. Defendant characterizes it as a voluntary resignation and a choice made by Plaintiff

that she freely made in response to a situation that was not objectively intolerable. Plaintiff, in contrast, characterizes it as a termination made against her will when Defendant failed to adequately address her complaint of harassment and she responded reasonably, or, in the alternative, as a constructive discharge (admitting that she technically left of her own volition, but that she did so as "a fitting response" to an "intolerable" situation, see Pennsylvania State Police v. Suders, 542 U.S. 129, 134 (2004)). What sort of work environment is objectively intolerable under the NJLAD?

Under NJLAD, a constructive discharge claim requires "conduct that is so intolerable that a reasonable person would be forced to resign rather than continue to endure it." Shepherd v. Hunterdon Developmental Ctr., 174 N.J. 1, 28 (2002) (citing Jones v. Aluminum Shapes, Inc., 339 N.J.Super. 412, 428 (App.Div. 2001)); see also Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1084 (3d Cir. 1996)("In order to establish a constructive discharge, a plaintiff must show that the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign")(internal quotation omitted). "'[A] constructive discharge claim requires more egregious conduct than that sufficient for a hostile work environment claim,' because 'constructive discharge requires not merely "severe or

pervasive" conduct, but conduct that is so intolerable that a reasonable person would be forced to resign rather than continue to endure it.'" <u>Lin v. Dane Const. Co.</u>, No. EM14WB-54045, 2014 WL 8131876, at *9 (N.J. App. Div. Mar. 17, 2015)(quoting <u>Shepherd</u>, 174 N.J. at 28). "Summary judgment is appropriate if a trier of fact could not reasonably conclude that a reasonable person in the plaintiff's shoes would have felt compelled to resign." <u>Al-Salem v. Bucks Cty. Water & Sewer Auth.</u>, No. 97-6843, 1999 WL 167729, at *8 (E.D.Pa. Mar. 25, 1999)(citation omitted)(holding that a "reasonable person would not feel compelled to resign in October 1995 because of insults experienced in 1992 or 1993. A reasonable person who felt aggrieved by not receiving an earlier promotion would not feel compelled to resign ten weeks after securing that promotion. . . . [N]o reasonable person could find that the loss of the use of a truck to commute or the need to sign training and briefing forms . . . resulted in working conditions so intolerable that a reasonable employee would have resigned").

The Third Circuit has expressly declined to hold "as a broad proposition of law that a single non-trivial incident of discrimination can never be egregious enough to compel a reasonable person to resign. An employment discrimination plaintiff may simply face a more difficult burden of proof in establishing the employer's liability, when relying on a single

discriminatory incident as a basis for arguing the occurrence of constructive discharge." Levendos v. Stern Entertainment, Inc., 860 F.2d 1227, 1232 (3d Cir. 1988). "[A] reasonable employee will usually explore . . . alternative avenues [such as: requesting to be transferred, advising the employer that they would be compelled to leave if requested changes were not made, or even filing a grievance,] thoroughly before coming to the conclusion that resignation is the only option[,]" although the Third Circuit "do[es] not require that such steps be taken in all cases[, as a]n employee may be able to show working conditions were so intolerable that a reasonable employee would feel forced to resign without remaining on the job for the period necessary to take those steps." Clowes v. Allegheny Valley Hosp., 991 F.2d 1159, 1161, 1161 n.6 (3d Cir. 1993)(citation omitted).

In analyzing a claim for constructive discharge, the Third Circuit has stated that "'[a] trial court should consider the nature of the harassment, the closeness of the working relationship between the harasser and the victim, whether the employee resorted to internal grievance procedures, the responsiveness of the employer to the employee's complaints, and all other relevant circumstances[,]'" in addition to an employee's "obligation to do what is necessary and reasonable in order to remain employed rather than simply quit." Kirschling v.

Atl. City Bd. of Educ., 604 F. App'x 153, 155 (3d Cir. 2015) (quoting Shepherd, 174 N.J. at 28)).

Here, the Court has previously ruled that a reasonable jury could conclude that the incident perpetrated by Hankins involved a particularly vicious, disgusting, and offensive comment, arising out of no interaction with Plaintiff, directed squarely at her, and notable for the numerous aspects of its insult. While Hankins and Plaintiff did not regularly work closely together, they were exposed to each other in common areas on a daily basis and frequently (albeit not regularly) worked together on the floor; even under Defendant's proposed remedial plan as of March of 2015, as noted above, Plaintiff would have been required to share the common spaces with Hankins at the location where he initially harassed her. Plaintiff indisputably resorted to internal grievance procedures, and has raised a genuine dispute of material fact as to whether Defendant was adequately responsive in addressing her complaints. Plaintiff expressed what a reasonable factfinder could perceive to be her objectively reasonable dissatisfaction with Defendant's proposed remedial plan, and she proposed what that factfinder could perceive to be an alternative, also-reasonable plan that would be more likely to actually prevent further harassment by Hankins. That factfinder would also be reasonable to conclude that Defendant's failure to implement, attempt to implement, or

even seriously consider that alternative plan was inexplicable and contributed to creating an "intolerable" situation for Plaintiff. There is, then, at least a genuine dispute of material fact as to whether Plaintiff satisfied her "obligation to do what is necessary and reasonable in order to remain employed rather than simply quit."

While the Court previously ruled that Plaintiff's Complaint failed to state a claim for constructive discharge, <u>Nuness</u>, 221 F. Supp. 3d at 604-05, the development of the factual record has allowed Plaintiff to put forth sufficient evidence now to survive Defendant's motion for summary judgment on this point. Critical to the Court's previous analysis was the presumption that Plaintiff stopped coming to work even after she had evidence that suspending Hankins had altered his behavior and they had worked together thereafter without incident.[14]

---

[14] "Plaintiff argues that she has adequately pled a constructive discharge claim because she complained to HR about the racist remark after it was uttered, HR only suspended Mr. Hankins for a week, and then continued to schedule Plaintiff and Mr. Hankins on the same shift in the same departments despite Plaintiff's continued complaints to HR. After Mr. Hankins's return [] back to the shift, Plaintiff alleges that Ms. Tuccillo told her that 'despite her feeling uncomfortable, if she did not come to work she would be resigning.' After Plaintiff was absent from work for one week, she was terminated. Importantly, however, once Mr. Hankins returned from his one-week suspension, Plaintiff does not allege that she experienced any additional racially-insensitive conduct." <u>Id.</u> at 605.

While it remains undisputed that Plaintiff did not experience any additional racially-insensitive conduct, a reasonable finder of fact could easily conclude that this was because Plaintiff declined to place herself in the same position to be harassed, as a factfinder could reasonably conclude Defendant required her to do. For the reasons discussed above, Defendant is not entitled to a ruling as a matter of law that its remedial policy was effective, thereby rendering Plaintiff's actions unreasonable and insulating Defendant from liability on her claim of constructive discharge. The case cited by the Court previously, Nuness, 221 F. Supp. 3d at 605 (citing Aman, 85 F.3d at 1084), found the Third Circuit reversing a district court's grant of summary judgment to an employer on a constructive discharge claim, declining to find as a matter of law that "the conditions could not have been intolerable . . . because she remained in her job for approximately four months after claiming that they were intolerable" and that "the specific events that prompted her departure were insufficient as a matter [of] law." Aman, 85 F.3d at 1084. On the two points (which "must be addressed in tandem" in the particular case), the court stated: "We have rejected imposing an 'aggravated circumstances' requirement upon constructive discharge claims. . . . A jury could conclude that the conditions of her employment were

intolerable, and that while she had the fortitude to stay, her strength finally failed." Id. at 1084-85.

The Court reiterates that a constructive discharge claim requires a showing of conduct more severe or pervasive or otherwise worse, than that required for a hostile-work-environment claim. "Intolerable" is worse than either "severe" or "pervasive." But because the Court does not conclude that Plaintiff's evidence of a hostile work environment represents the "floor" of such a claim, there is still space, analytically, for her to pursue her constructive discharge claim. "A hostile-environment constructive discharge claim entails something more [than a showing that the offending behavior was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment]: A plaintiff who advances such a compound claim must show working conditions so intolerable that a reasonable person would have felt compelled to resign. . . ." Suders, 542 U.S. at 146-47. See Breeding v. Arthur J. Gallagher and Co., 164 F.3d 1151, 1159-60 (8th Cir. 1999)(insufficient "evidence to support a finding of constructive discharge" where "no evidence that age or sex discrimination, rather than actual performance problems, prompted the reprimands and the poor performance evaluations. The working atmosphere was not ideal, but 'a feeling of being unfairly criticized or [having to endure] difficult or

unpleasant working conditions are not so intolerable as to compel a reasonable person to resign.' Carter v. Ball, 33 F.3d 450, 459 (4th Cir. 1994)).”). Examples of "difficult or unpleasant working conditions" not amounting to constructive discharge abound.[15]

In Perry v. Harris Chernin, Inc., (cited with approval by the Supreme Court in Suders, 542 U.S. at 147), the Seventh Circuit stated: "[T]he plaintiff's resignation is not truly voluntary if quitting was the only way she could extricate herself from the intolerable conditions. But unless conditions are beyond 'ordinary' discrimination, a complaining employee is

---

[15] See Bristow v. Daily Press, Inc., 770 F.2d 1251, 1255 (4th Cir. 1985)(no reasonable person would have found the job intolerable although plaintiff may have experienced problems in managing his district due to the comparatively large size of his territory); Pena v. Brattleboro Retreat, 702 F.2d 322, 325-26 (2d Cir. 1983)(no constructive discharge where employer asked plaintiff to relinquish some management functions to her planned successor a year earlier than plaintiff desired but undisputedly did not want plaintiff to leave its employ; nor was plaintiff faced with a loss of pay or change in title); Clowes, 991 F.2d at 1160-61 ("hypercritical supervision" is not enough to prevail on constructive discharge claim); Martin v. Citibank, N.A., 762 F.2d 212,221 (2d Cir. 1985)(Where: supervisor loudly mentioned plaintiff having been polygraphed; unfounded complaints made regarding plaintiff's attitude; plaintiff given the wrong combination to the night deposit box and had her deposits interfered with by someone using supervisor's card; plaintiff required to process deposit records while serving customers; plaintiff informally disciplined for attitude, evidence insufficient to allow for jury verdict reflecting constructive discharge as evidence did not "sustain an inference that a reasonable person would have been 'compelled' to resign.").

expected to remain on the job while seeking redress. Quitting was not the only option available to Perry: Reynolds offered her work at another store away from Jackson. That offer changed the calculus facing Perry; quite simply, a reasonable person in her position would not have been compelled to resign her employment altogether," and the court attendantly found that "her constructive discharge claim should not have reached a jury[.]" 126 F.3d 1010, 1015 (7th Cir. 1997)(internal citations omitted, emphasis in original). See also Amirmokri, 60 F.3d at 1132-34 (focusing on employer's response and finding genuine dispute of fact as to whether allegedly inadequate response by employer allowed inference that plaintiff's "ultimate resignation was a reasonably foreseeable consequence of [defendant's] insufficient response" to what a reasonable factfinder could conclude was an objectively intolerable atmosphere of "almost daily" epithets based on plaintiff's national origin that created "constant stress[,]" "caused [plaintiff] to get an ulcer and eventually to resign"); Hoff v. Spring House Tavern, No. 13-0662, 2013 WL 2434615, at *4 (E.D.Pa. June 5, 2013)(court declined to hold single incident to be "so intolerable that a reasonable person in plaintiff's position would feel compelled to resign" where it could "hardly be said that this single comment was so severe and pervasive as to create a hostile work environment" and plaintiff "elected to leave the workplace" because he "was dissatisfied

with the lack of instant discipline enforced against his co-worker" but "did not really give [d]efendant a reasonable opportunity to remediate the situation and to improve the workplace environment")(emphasis added).

"In assessing a plaintiff's allegation of constructive discharge, the Third Circuit has instructed district courts to consider a number of factors known as the 'Clowes factors'--which are neither absolute nor comprehensive--including: '"(1) a threat of discharge; (2) suggestions or encouragement of resignation; (3) a demotion or reduction of pay or benefits; (4) involuntary transfer to a less desirable position; (5) alteration of job responsibilities; (6) unsatisfactory job evaluations."' Stremple v. Nicholson, 289 F. App'x 571, 574 n.1 (3d Cir. 2008); see also Clowes . . . , 991 F.2d . . . [at] 1161." Kirschling, 10 F. Supp. 3d at 596.

Here, the Clowes factors do not support Plaintiff's claim of constructive discharge, except inasmuch as Defendant threatened to terminate her for failing to appear for work. Her claim is better understood as claiming that Defendant constructively discharged her by requiring her to again expose herself to the person who allegedly severely harassed her, without adequately remediating the situation. Although the question presented is not precisely like that presented to the court in Amirmokri (where the Fourth Circuit attempted to

discern whether evidence existed to support the contention that the plaintiff's resignation was reasonably foreseeable in response defendant's inadequate remediation), there the court did find relevant the defendant's allegedly inadequate response in assessing whether a constructive discharge could reasonably be said to have occurred.

Furthermore, a reasonable jury may find from these disputed facts that Plaintiff's behavior in "request[ing] to be transferred to another [shift], . . . advis[ing Defendant] that she would feel compelled to leave if changes regarding [her working environment] were not made, and . . . [promptly] fil[ing] a grievance" to be "<u>highly significant</u>" and weigh strongly in favor of allowing a reasonable finder of fact to conclude that Plaintiff's response was that of a reasonable employee who "will usually explore such alternative avenues thoroughly before coming to the conclusion that resignation is the only option." <u>Clowes</u>, 991 F.2d at 1161 (emphasis added).[16]

---

[16] The Court expresses no opinion on whether Defendant's May 2015 offer of reinstatement would have a limiting effect on Plaintiff's right to backpay or other equitable remedies as of the date of her refusal, as discussed <u>supra</u> at Note 1. <u>See</u>, <u>e.g.</u>, <u>Ford Motor Co. v. E.E.O.C.</u>, 458 U.S. 219, 230 (1982)(if a prevailing plaintiff "had rejected an unconditional offer" of reinstatement from the defendant, "tolling [the defendant's] backpack liability from the time of [its] offer plainly would be consistent with providing [the plaintiff] full compensation for their injuries" because the plaintiff "is subject to the statutory duty to minimize damages"); <u>Bruno v. W.B. Saunders Co.</u>, 882 F.2d 760, 770 (3d Cir. 1989)(recognizing that

Ultimately, the Court is persuaded that it would be a mistake to substitute its judgment of what a reasonable person in Plaintiff's position would do, and whether Plaintiff's apparently sincerely-held, good-faith[17] belief that it would be intolerable for her to continue to work (as Defendant required her to do) in the same context that produced the initial harassment, and whether that belief and the ensuing actions were objectively reasonable or unreasonable, for the sound judgment of a rational fact-finder. See Schafer v. Board of Pub. Ed. of the Sch. Dist. of Pittsburgh, 903 F.2d 243, 250 (3d Cir. 1990)("On appeal, we cannot make the fact-finding required to determine whether it was reasonable for Schafer to resign"). Accordingly, the Court DENIES summary judgment on Defendant's motion as to Plaintiff's constructive discharge claim.

### C. Retaliatory Discharge Claim

---

plaintiff's failure to accept a substantially equivalent job offered by the defendant will toll the accrual of back pay liability by the defendant employer, although "the plaintiff's obligation in this regard [is] not absolute").

[17] There is no suggestion in the evidentiary record that Plaintiff declined to return to work for any reason other than her objection to continuing to have to work with Hankins and be exposed to the reasonable possibility of continued harassment by him. However, the Court notes that the constructive discharge inquiry is purely an objective one: "[P]otential jurors could not rely on evidence regarding the impact the conduct had on Plaintiff, whose subjective perceptions do not govern[.]" Kirschling, 10 F. Supp. 3d at 601.

Finally, Defendant argues that Plaintiff's retaliatory discharge claim should fail because Defendant's did "not take any adverse employment action against Plaintiff," and even if Plaintiff could show otherwise, no causal connection between Plaintiff's protected activity and her termination exists.

Under the NJLAD, retaliation against an employee because that employee "has opposed any practices or acts forbidden under [the NJLAD] or because that person has filed a complaint, testified or assisted in any proceeding under [the NJLAD,]" is unlawful. N.J.S.A. § 10:5-12(d); Cortes v. Univ. of Med. & Dentistry of N.J., 391 F.Supp.2d 298, 314 (D.N.J. 2005).

For a plaintiff to establish a prima facie case for retaliation under the NJLAD, a plaintiff must show that she (1) engaged in protected activity, (2) that she suffered an adverse employment action, and (3) that there was a causal connection between the protected activity and the adverse employment action. Cardenas v. Massey, 269 F.3d 251, 263 (3d Cir. 2001); see also Battaglia v. United Parcel Serv., Inc., 214 N.J. 518, 70 A.3d 602, 619 (2013). Furthermore, "the plaintiff bears the burden of proving that his or her original complaint—the one that allegedly triggered his or her employer's retaliation—was made reasonably and in good faith." Carmona v. Resorts Int'l Hotel, Inc., 189 N.J. 354, 915 A.2d 518, 521 (2007).

1. Adverse Employment Action

Pursuant to the NJLAD, "[r]etaliatory action" is "the discharge, suspension or demotion of an employee, or other adverse employment action taken against an employee in the terms and conditions of employment." N.J.S.A. 34:19-2(e). Moreover, "retaliatory conduct must affect adversely the terms, conditions, or privileges of the plaintiff's employment or limit, segregate or classify the plaintiff in a way which would tend to deprive her of employment opportunities or to otherwise affect her status as an employee." Marrero v. Camden Cty Bd. of Soc. Servs., 164 F.Supp.2d 455, 473 (D.N.J. 2001). "Certainly, a constructive discharge, if it occurred, constitutes an adverse employment action." Mieczkowski v. York City Sch. Dist., 414 F. App'x 441, 445 (3d Cir. 2011)(citing Hill v. Borough of Kutztown, 455 F.3d 225, 247 n.32 (3d Cir. 2006)).

Plaintiff claims she suffered an adverse employment action when Defendants terminated her employment after her harassment complaint to HR, her "reasonable refusal to acquiesce to [Defendants'] demand that she continue to work side-by-side with her harasser and her subsequent threat to hire an attorney." [Docket Item 28 at 21-22.] Plaintiff has provided sufficient evidence from which a reasonable factfinder could conclude that Defendant in fact terminated her and that termination was an adverse material action.

First, as stated above, the Court has found a genuine dispute of material fact as to Plaintiff's constructive discharge claim. A "constructive discharge is an adverse employment decision." Hill, 455 F.3d at 247 n.32.

Even if this were not so, Plaintiff has certainly put forth sufficient evidence to allow a reasonable finder of fact that she was terminated (even if that finder of fact does not conclude that, e.g., the working conditions were objectively "intolerable" as is required to establish a constructive discharge).

Here, after receiving permission from Defendant, Plaintiff returned to work after missing a few days after Hankins harassed her. Upon her return, Plaintiff was informed that Hankins would be returning to work after his suspension, and to work the same shift as her. The parties dispute whether Defendant told Plaintiff she would have her "work side by side with [Hankins.]" (Pl. Resp. SMF ¶ 18; Pl. Dep. at 65:1-9; Def. SMF ¶ 18.) Regardless, any separation of Plaintiff and Hankins would not have covered the common areas they would have shared. (Tuccillo Dep. at 50:20-51:4.)

Plaintiff thereafter, on multiple occasions, explained to Defendant's HR Department her discomfort in working with Hankins, specifically claiming she was unable to return because of "the hostile work environment" but that she "would not

resign." (Pl. Resp. SMF ¶ 25; Pl. Ex. L.) Despite Defendant's argument that Plaintiff's actions "constituted job abandonment," Plaintiff explicitly expressed that she did not want to lose her job. Indeed, her actions in requesting alternative outcomes bear this out: Plaintiff requested that either she or Hankins be moved to a different shift so that they would not share the same common areas where the harassment originally occurred, to no avail. Nevertheless, in an email to Tuccillo, Plaintiff again explained she should not "have to come to work in these conditions," but that "I hope I can return to work soon without being forced to work side by side with someone who has a problem with me because of the color of my skin."

The record suggests that Defendant's only response was to inform Plaintiff that she would be terminated if she did not return to work and thereafter, so terminated her. (Def. SMF ¶ 25.) "[T]ermination is the most obvious example of adverse employment action[.]" Marrero, 164 F.Supp.2d at 473. This record, when viewed in the light most favorable to Plaintiff, would allow a reasonable jury to find that her separation from employment on March 20, 2015 constituted a termination and an adverse employment action.

2. Causal Connection

Defendants argue in the alternative that if Plaintiff can show there was an adverse employment action, her retaliation claim still fails because she cannot establish the requisite causal connection.

A plaintiff may demonstrate causation in a retaliation claim by showing: (1) a close temporal relationship between the protected activity and the adverse action, or (2) that "the proffered evidence, looked at as a whole, ... raise[s] the inference [of causation]." LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217, 232 (3d Cir. 2007). "Where the temporal proximity between the protected activity and the adverse action is 'unusually suggestive,' it is sufficient standing alone to create an inference of causality and defeat summary judgment." Id. (citing Breeden, 532 U.S. at 273–74, and noting that "temporal proximity alone, when 'very close,' can in some instances establish a prima facie case of retaliation").

 "[W]here the temporal proximity is not 'unusually suggestive,' we ask whether 'the proffered evidence, looked at as a whole, may suffice to raise the inference.'" LeBoon, 503 F.3d at 232 (quoting Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280 (3d Cir. 2000)(internal citation and quotation marks omitted)). In determining causation at the summary judgment stage, courts consider "a broad array of evidence." Farrell, 206 F.3d at 284 (3d Cir. 2000).

Here, it is undisputed that Plaintiff made the report on March 11, 2015 and was separated from her employment with Defendant on March 23, 2015, in the space of two weeks. Such an amount of time would amount to close temporal proximity, allowing for an inference of a causal connection. The Court understands the thrust of Defendant's argument to be that any reasonable factfinder would be required to conclude that Plaintiff's intervening conduct (i.e., her refusal to return to work after Hankins was disciplined) breaks the causal chain. [Docket Item 25-1 at 24-25, stating that Plaintiff was "terminated for failing to report to work."] However, with regard to a defendant's direct (as opposed to vicarious) liability, the Third Circuit has stated that "even a plaintiff who fails to return to work because of dissatisfaction with the remedial action chosen by the employer can" nevertheless "present enough evidence to show . . . that the remedial action was not 'reasonably calculated' to prevent further acts of harassment" and thereby "withst[an]d summary judgment." Knabe, 114 F.3d at 415. The court apparently contemplated the withstanding of summary judgment even where a plaintiff failed to return to work in the precise circumstances presented here, although the plaintiff there did not "plead a retaliation count" in her complaint. Id. at 408 n.1.

This is substantially different from the cases Defendant cites in support of this proposition, where the causal connection was undermined by undisputed evidence that the plaintiffs were terminated for <u>unrelated</u> performance issues.[18] These circumstances are not present here; Plaintiff's purported "absenteeism" was apparently directly and only caused by her dissatisfaction with Defendant's response to the alleged harassment by Hankins, and was not "unrelated" to her complaint about it; nor did it "predate" her protected activity.

Accordingly, the Court finds that Plaintiff has raised the preliminary inference, due to temporal proximity, that there was

---

[18] <u>See</u> <u>Cavicchia v. Phila. Hous. Auth.</u>, 137 F. App'x 495, 497 (3d Cir. 2005)(summary judgment appropriate on plaintiff's "claim under Pennsylvania's Whistleblower Statute," which has a "standard more stringent than the one for a First Amendment retaliation claim" where "there [wa]s no evidence supporting a causal connection between Cavicchia's report of wrongdoing and his termination for absenteeism" when plaintiff "did not dispute that he was absent, but argued . . . that this reason was pretextual because [he] should have been subjected to more progressive discipline under PHA's discretionary policy"); <u>Bimbo v. Burdette Tomlin Memorial Hosp.</u>, 644 F. Supp. 1033, 1037 (D.N.J. 1986)("preliminary inference of causation" from temporal proximity of demotion to protected activity "unequivocally overcome . . . by the defendant's proof of a legitimate non-discriminatory reason for its action" including "highly credible testimony" "that the reasons given to plaintiff for her demotion were in fact problems perceived well in advance of her letter . . . and that numerous conversations with plaintiff were held over a considerable period of time apprising her of the perceived need for improvement with respect to these elements of her job performance. The evidence further showed that plaintiff was, in fact, late for work at least 104 times in the calendar year immediately preceding her demotion").

a causal connection between her complaint and her termination, and there is a genuine dispute of material fact as to whether that causal chain was broken. Summary judgment on this ground is therefore not appropriate, and Defendant's motion for summary judgment as to retaliation shall be DENIED.

## V.    CONCLUSION

For the foregoing reasons, the Court will DENY Defendants' Motion for Summary Judgment in its entirety. An accompanying Order will be entered.


**June 29, 2018____**                    **s/ Jerome B. Simandle____**
Date                                     JEROME B. SIMANDLE
                                         U.S. District Judge